# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| In re | DC No. 8:19-cv-00405-LSC |
| Specialty Shops Holding Corp., *et. al.*,[1] | Bk. No. 19-80064-tls |
| Debtors. | |
| McKesson Corporation, | |
| Appellant, | |
| v. | |
| Specialty Shops Holding Corp., *et. al.*, | |
| Appellees. | |

## APPELLANT MCKESSON CORPORATION'S OPENING BRIEF

Appeal From:

Order Denying Request for Payment of Administrative Claim Entered August 30,

2019

Thomas L. Saladino

United States Bankruptcy Judge

for the District of Nebraska

---

[1] The Debtors in these Chapter 11 cases are: Specialty Retail Shops Holding Corp.; Pamida Stores Operating Co., LLC; Pamida Transportation LLC; Penn-Daniels, LLC; Place's Associates' Expansion, LLC; Retained R/E SPE, LLC; Shopko Finance, LLC; Shopko Gift Card Co., LLC; Shopko Holding Company, LLC; Shopko Institutional Care Services Co., LLC; Shopko Optical Manufacturing, LLC; Shopko Properties, LLC; Shopko Stores Operating Co., LLC; SVS Trucking, LLC.

# **TABLE OF CONTENTS**

**Page**

I. CORPORATE STATEMENT.................................................................1

II. BASIS OF APPELLATE JURISDICTION.......................................1

III. ISSUES ON APPEAL ..................................................................1

IV. STANDARD OF REVIEW .............................................................2

V. STATEMENT OF THE CASE.........................................................3

     A.    The Debtors and their Bankruptcy Cases ..............................3

     B.    McKesson's Prepetition Reclamation Demands...................3

     C.    McKesson's Postpetition Efforts to Protect its Reclamation Rights ....5

     D.    The Reclamation Settlement Agreement ...............................6

     E.    Debtors' Post-petition Sale of Pharmacy Assets...................9

     F.    Continuation of the Remainder of the Debtors' Business Operations, and Use of the Proceeds of the Reclamation Goods to Fund Their Bankruptcy Cases and Operations...................11

     G.    McKesson's Administrative Claim and the Scheduling Stipulation...13

     H.    The Hearing and the Bankruptcy Court's Ruling ...............15

VI. SUMMARY OF ARGUMENT.......................................................19

VII. ARGUMENT ................................................................................22

     A.    The Eighth Circuit's Strong Protection of Reclamation Rights Has its Roots in the Earliest Formulations of Our Common Law ............22

     B.    McKesson Is Entitled to an Administrative Claim under Bankruptcy Code Section 546(c) ........................................28

          1.    The Effect of the BAPCPA Amendments to Section 546(c)....28

          2.    McKesson Holds a Valid Reclamation Claim .........................35

C.    Even if Post-BAPCPA Section 546(c) Generally Prohibits an Administrative Claim, the McKesson Administrative Claim Fits into an Exception to the General Rule ................................................40

D.    McKesson Is Entitled to an Administrative Claim under Bankruptcy Code Section 503(b)(1)(A)................................................42

E.    The Bankruptcy Court Erred Procedurally .........................................47

VIII. CONCLUSION ...............................................................................................49

Certificate Pursuant to Federal Rule of Bankruptcy Procedure 8015(h)................50

BN 38038816v4

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bassett Furniture Indus., Inc. v. Wear* (*In re PFA Farmers Market Assoc.*),
  583 F.2d 992 (8th Cir. 1978) ........................................................................ 24, 25

*Corporate Assets, Inc. v. Paloian*,
  368 F.3d 761 (7th Cir. 2004) ...................................................................................44

*Dewsnup v. Timm*,
  502 U.S. 410 (1992) ...................................................................... 29, 30, 31, 32

*Diwan, LLC v. Maha-Vishnu* (*In re Diwan, LLC*)
  848 F.3d 1147 (8th Cir. 2017) ...................................................................................2

*Gillespie v. J.C. Piles & Co.*,
  178 F. 886 (8th Cir. 1910) ........................................................................... 23, 33

*In re Alan Wood Steel Co.*,
  2 B.R. 161 (Bankr. E.D. Pa. 1980) ...........................................................................45

*In re Griffin Retreading Co.*,
  795 F.2d 676 (8th Cir. 1986) ...................................................................... 26, 27, 33

*In re Houlihan's Restaurant*,
  286 B.R. 137 (Bankr. W.D. Mo. 2002) .....................................................................46

*In re Munce's Superior Petroleum Prods.*,
  736 F.3d 567 (1st Cir. 2013) ....................................................................................44

*In re Peninsula Gunite, Inc.*,
  24 B.R. 593 (B.A.P. 9th Cir. 1982) ..........................................................................46

*In re Pester Ref. Co.*,
  964 F.2d 842 (8th Cir. 1992) ............................................................................ passim

*In re Professional Veterinary Products, Ltd.*,
  454 B.R. 479 (Bankr. D. Neb. 2011) ................................................................ 40, 41

*In re Reichold Holdings US, Inc.*
  556 B.R. 107 (Bankr. D. Del. 2016) ................................................................ 34, 36, 37

*In re Shreyas Hospitality, LLC*,
  2010 Bankr. LEXIS 2074 (Bankr. C.D. Ill. 2010) .................................................46

iii

*In re ZiLOG, Inc.,*
    450 F.3d 996 (9th Cir. 2006) ................................................................45

*O'Rieley v. Endicott-Johnson Corp.,*
    297 F.2d 1 (8th Cir. 1961) ............................................... 24, 25, 33, 47

*Reading Co. v. Brown,*
    391 U.S. 471 (1968) ............................................................... 43, 44

*Sanchez v. Northwest Airlines, Inc.,*
    659 F.3d 671 (8th Cir. 2011) ..............................................................44

*Shelton v. Citimortgage, Inc.* (*In re Shelton*),
    735 F.3d 747 (8th Cir. 2013) ....................................................... 29, 30

*U.S. v. Noce,*
    268 U.S. 613 (1925) ......................................................................34

*U.S. v. Texas,*
    507 U.S. 529 (1993) ......................................................................30

*U.S. v. Westside Bank,*
    732 F.2d 1258 (5th Cir. 1984) ............................................................38

*Williams v. King* (*In re King*),
    744 F.3d 565 (8th Cir. 2014) ..............................................................2

*Zahn v. Fink* (*In re Zahn*),
    526 F.3d 1140 (8th Cir. 2008) .............................................................2

**Federal Statutes**

11 U.S.C.

    § 361 ..................................................................................6

    § 363 ..................................................................................6

    § 503(b)(1)(A) ................................................................... *passim*

    § 503(b)(7) ...........................................................................32

    § 503(b)(9) ..................................................................... *passim*

    § 506(d) ..................................................................... 29, 30, 31

    § 507(b) ..............................................................................7, 8

BN 38038816v4

§ 546(c) .................................................................................. *passim*

§ 546(c)(1) ....................................................................................30

§ 546(c)(2) ....................................................................................30

28 U.S.C.

§ 158(a)(1) ......................................................................................1

§ 158(c)(1)(A) ..................................................................................1

UCC
§ 2-702(2) ................................................................ 23, 24, 25, 31

**State Statutes**

Wis. Stat.
§ 402.702 ................................................................................ 4, 36

**Federal Rules of Bankruptcy Procedure**

Rule 8012 ........................................................................................1

Rule 8015(a)(7)(B) ........................................................................50

Rule 8015(h) ..................................................................................50

**Other Authorities**

A. Scalia and B. Garner,
*Reading Law: The Interpretation of Legal Texts*, 1st ed. 2012 ............................34

H. R. No. 109-31, pt. 1,
109th Cong., 1st Sess.146 (2005) ..........................................................32

J. Cook,
*Section 2-702(2): A Seller's Prima Facie Case and the Obligation of Good Faith*, 10 B.C. L. Rev. 634 (1969). ....................................................23

L. Garvin, *Credit, Information, and Trust in the Law of Sales: The Credit Seller's Right of Reclamation*, 44 UCLA L. Rev. 247 (1996) ...................... 22, 23

BN 38038816v4

# I.
## CORPORATE STATEMENT

Pursuant to Federal Rule of Bankruptcy Procedure 8012, Appellant McKesson Corporation ("McKesson") states that it has no parent corporation, nor does any publically held corporation own 10% or more of its stock.

# II.
## BASIS OF APPELLATE JURISDICTION

The District Court has jurisdiction to hear appeals from final orders of the Bankruptcy Court if a party elects to have the appeal heard by the District Court. 28 U.S.C. § 158(a)(1); 28 U.S.C. § 158(c)(1)(A). McKesson elected at the time of filing this appeal to have this appeal heard by the District Court. [Appellant's Appendix of Excerpts of Record ("AER") A463]. In addition, as noted by the Bankruptcy Court in the order appealed from ". . . all issues raised in the Request for Payment have been addressed and this Order is final for purposes of appeal." [AER A462]. Accordingly, the order appealed from is a final order.

# III.
## ISSUES ON APPEAL

1.      Whether the Bankruptcy Court erred in concluding that McKesson is not entitled to an administrative claim on account of its reclamation rights pursuant to Bankruptcy Code section 546(c).

BN 38038816v4

2.      Whether the Bankruptcy Court erred in concluding that McKesson is not entitled to an administrative claim on account of its reclamation rights based on its rights under the Pharmacy Sale Order (defined below).

3.      Whether the Bankruptcy Court erred in concluding that McKesson is not entitled to an administrative claim on account of its reclamation rights pursuant to Bankruptcy Code section 503(b)(1)(A).

## IV.
## STANDARD OF REVIEW

In the Eighth Circuit, a bankruptcy court's interpretation of the Bankruptcy Code is reviewed *de novo*, and its findings of fact are reviewed for clear error. *Zahn v. Fink* (*In re Zahn*), 526 F.3d 1140 (8th Cir. 2008); *Diwan, LLC v. Maha-Vishnu* (*In re Diwan, LLC*) 848 F.3d 1147 (8th Cir. 2017) ("Like the district court, we review the bankruptcy court's factual findings for clear error, its legal conclusions *de novo*, and issues committed to its sound discretion for an abuse of that discretion."); *Williams v. King* (*In re King*), 744 F.3d 565 (8th Cir. 2014) (conclusions of law reviewed *de novo* and findings of fact reviewed for clear error).  Here, all of the issues on appeal involve legal conclusions.  Accordingly, the issues in this appeal are reviewed *de novo*.

BN 38038816v4

# V.
## STATEMENT OF THE CASE

### A.    The Debtors and their Bankruptcy Cases

Debtors commenced voluntary cases under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") on January 16, 2019 (the "Petition Date"). Debtors' bankruptcy cases were administratively consolidated pursuant to an order entered on January 16, 2019.  [AER A194].  Prior to the Petition Date, Debtors operated over 300 general merchandise stores throughout the Midwestern, Northwestern, and Southwestern regions of the country.  [AER A194].  Debtors operated their stores under the "Shopko" tradename.  [AER A194].  Debtors offered a broad assortment of general merchandise, including clothing and accessories, electronics and home furnishings, as well as in-store and stand-alone pharmacies and optical services departments.  [AER A194].  Prior to the Petition Date, Debtors operated over 230 pharmacy locations.  [AER A194].

### B.    McKesson's Prepetition Reclamation Demands

On or about February 1, 2017, Shopko Stores Operating Co., LLC ("Shopko Stores") entered into a Restated Supply Agreement (together with all amendments, the "Supply Agreement") for the supply of prescription drugs and other health and beauty care products (collectively, the "Pharmaceutical Goods") by McKesson to the pharmacies operated by Shopko Stores.  [AER A258].  Under the Supply Agreement, McKesson served as Debtors' primary pharmaceutical supplier and

BN 38038816v4

delivered the Pharmaceutical Goods to those pharmacies.  As Debtors acknowledge, virtually all of their pharmaceutical inventory was supplied by McKesson.

During the 45 days immediately prior to the Petition Date (the "Reclamation Period"), Shopko Stores purchased and received over $38 million in Pharmaceutical Goods from McKesson (the "Reclamation Goods").   [AER A258–59].   On December 30, 2018, seventeen (17) days prior to the Petition Date, McKesson transmitted to Shopko Stores (via facsimile, overnight mail and electronic mail) a demand for the immediate return of the goods received by Debtors during the Reclamation Period pursuant to Wis. Stat. § 402.702 (the "Reclamation Demand Letter").[2]   [AER A258–59].

Shopko Stores failed to comply with the Reclamation Demand Letter and McKesson's lawful demand for return of the Reclamation Goods.  Instead, Shopko Stores continued to sell the Reclamation Goods, causing irreparable harm to McKesson.  With no other alternative to preserve its rights to reclaim the goods, on January 4, 2019, McKesson filed a Complaint seeking reclamation of the Reclamation Goods, along with causes of action for replevin and breach of contract (the "Complaint") in the State of Wisconsin Circuit Court for Brown County (the "Wisconsin State Court"), Case Number 19-CV-33.  [AER A348].  Among other things, the Complaint alleged that prior to the Petition Date, Debtors made both

---

[2]        The Supply Agreement is governed under Wisconsin law.

BN 38038816v4

written and oral misrepresentations to McKesson regarding their solvency and their ability to pay for goods purchased from McKesson.   [AER A354].   These misrepresentations induced McKesson to supply millions of dollars worth of goods to Debtors on credit.

Concurrently with the filing of the Complaint, McKesson filed an *Ex Parte* Motion for Temporary Restraining Order and Temporary Injunction seeking an order prohibiting Shopko Stores from selling, moving, relocating, or destroying any Pharmaceutical Goods delivered by McKesson to any of Shopko Stores' stores on or after November 11, 2018 (the "TRO Motion").   An initial hearing on the TRO Motion was held on January 7, 2019 (the "TRO Hearing").   Concluding that there could be negative public health effects if the TRO Motion were granted, the Wisconsin State Court denied McKesson's request and scheduled a hearing to consider a preliminary injunction on January 24, 2019.  [AER A344].  As a result of Debtors' January 16, 2019 bankruptcy filing and the resulting imposition of the automatic stay, that hearing did not take place.

## C.   McKesson's Postpetition Efforts to Protect its Reclamation Rights

On the Petition Date, Debtors filed their Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Financing [etc.] (the "DIP Financing Motion").  [AER A036].  Around noon on the Petition Date, and before the "first day" hearing on the DIP Financing Motion, McKesson filed a Limited

5

Objection to the DIP Financing Motion (the "McKesson DIP Objection").  [AER A038].  In that objection, McKesson explained its reclamation rights and demands, and objected to the proposed DIP financing to the extent that it impaired McKesson's reclamation rights.  In addition, if the DIP Financing Motion was to be approved, McKesson demanded adequate protection of its interest in the Reclamation Goods pursuant to Bankruptcy Code sections 361 and 363 because a reclaiming seller holds an interest in delivered goods that is entitled to adequate protection.

Also on the Petition Date, Debtors filed their Motion for orders establishing bidding procedures and approving Debtors' proposed sale of their pharmacy assets (the "Pharmacy Sale Motion").  [AER A001].  During the portion of the "first day" hearing addressing the Pharmacy Sale Motion, McKesson again raised objections based on its reclamation rights in connection with the goods to be sold (the "McKesson Sale Objection").  [AER A105–11].

## D.    The Reclamation Settlement Agreement

On or about January 25, 2019, McKesson and Debtors entered into a Stipulation and Settlement Agreement (the "Settlement Agreement"), pursuant to which, among other things, McKesson agreed to withdraw the McKesson DIP Objection and the McKesson Sale Objection, as well as withdraw its then-pending motion for change of venue.  [AER A178].  On January 29, 2019, Debtors filed their "Motion for Approval of a Settlement with McKesson Corporation Inc. [sic]

6

Pursuant to Federal Rule of Bankruptcy Procedure 9019" (the "Settlement Approval Motion"). [AER A165]. The Court entered its text Order approving the Settlement Agreement on March 15, 2019 (the "Settlement Order"). [AER A256].

Under the Settlement Agreement, McKesson obtained two separate "buckets" of rights regarding its reclamation claims. First, pursuant to section 2. of the Settlement Agreement, McKesson retained any rights it had "under the Bankruptcy Code or applicable law to assert a claim and file a proof of claim for reclamation with respect to the [Reclamation Goods] and marshalling rights, if any." [AER A179]. In connection with this bucket of rights, McKesson agreed that any such claim would be subordinate to the liens, claims and interests of Debtors' post-petition Lenders, and that other than filing a proof of claim, McKesson would take no action on account of such claims. [AER A179]. Nothing in section 2. barred McKesson from filing an administrative claim (as opposed to a general unsecured claim) on account of its reclamation rights. [AER A179].

Second, pursuant to section 3. of the Settlement Agreement, McKesson is entitled to a superpriority administrative claim pursuant to Bankruptcy Code section 507(b) on account of its reclamation rights if (a) all obligations in connection with Debtors' pre and post-petition financing are indefeasibly paid in full in cash in accordance with the underlying post-petition loan agreement (the "Loan Agreement"); and (b) the Court enters a final order providing that, as of the Petition

7

Date, McKesson held a valid enforceable reclamation claim with respect to the Reclamation Goods, and enforceable marshalling rights related thereto. If these two conditions are met, McKesson's claim will be treated as a superpriority 507(b) administrative claim to the extent allowed under section 507(b).[3] [AER A179–80].

The Settlement Agreement also required Debtors to return to McKesson any Reclamation Goods remaining in their possession no later than 120 days after entry of the Settlement Order (the "Return Goods"). [AER A180]. Debtors are entitled to a credit for the Return Goods in accordance with the procedures governing returns under the Supply Agreement (the "Return Goods Credit"). The Return Goods Credit is to be applied on a 50/50 basis between McKesson's allowed 503(b)(9) claim, if any, and its allowed claim under section 507(b), if any. [AER A180]. To the extent McKesson does not hold allowed claims under each of those sections, the applicable portion of the Return Goods Credit is to be applied to McKesson's general unsecured claim. [AER A180].

The amount of the Return Goods Credit is determined based on formulas contained in the Supply Agreement, and is always less than the purchase price of the goods returned to McKesson. [AER A180]. At the time of the hearing on McKesson's administrative claim, the ultimate amount of the Return Goods Credit

---

[3] While McKesson's entitlement to a superpriority claim under Bankruptcy section 507(b) pursuant to Paragraph 3. of Settlement Agreement was at issue before the Bankruptcy Court, that issue is not part of this appeal.

was unknown.  What was known, however, was that the Return Goods Credit would be nothing close to the $9.1 million in face value returns alleged by Debtors.[4] [AER A313–14].

**E.    Debtors' Post-petition Sale of Pharmacy Assets**

On the Petition Date, Debtors filed their Motion for Entry of Orders (I) Establishing Bidding Procedures for the Pharmacy Assets, (II) Approving the [Sale] Transactions [etc.] (the "Pharmacy Sale Motion").  [AER A001].  Through the Pharmacy Sale Motion, Debtors sought to sell virtually all of their pharmacy assets, (the "Pharmacy Assets") including the Reclamation Goods.  Following approval of the Pharmacy Sale Motion at the January 16, 2019 "first day" hearing, on January 29, 2019, the Court entered its Order (1) Authorizing the Transactions of Certain Pharmacy Assets Free and Clear of all Interests [etc.] (the "Pharmacy Sale Order").  [AER A149].  Pursuant to the Pharmacy Sale Order, the Pharmacy Assets were sold free and clear of all interests, with interests in the Pharmacy Assets attaching to the proceeds of sale.  [AER A159].  The term "interests" included all liens, claims, rights, interests, charges, and encumbrances.  [AER A028–29].

---

[4]    Whether, and to what extent, any Return Goods Credit reduces the ultimate amount of the McKesson Administrative Claim was not the subject of the underlying proceeding.

In the Disclosure Statement for the Second Amended Joint Chapter 11 Plan (the "Disclosure Statement"), the Debtors describe the pharmacy sale process and outcomes as follows:

> Having begun the process with approximately 234 pharmacy locations, Debtors and Houlihan Lokey identified 134 locations with then actionable bids from six parties for the purchase of such respective Pharmacy Assets. Of the 134 locations with attractive bids, the Debtors were able to execute and close agreements for 82 of the locations prior to the Petition Date. The closing of the sales for the Pharmacy Assets at these 82 locations resulted in approximately $95 million in proceeds. . . .[5]

> Pursuant to the Pharmacy Sale Bidding Procedures Order, the Debtors conducted an auction on January 23, 2019 of certain remaining Pharmacy Assets. The Debtors sold Pharmacy Assets at 31 locations as part of the auction, generating over $21 million of proceeds. The Debtors generated total proceeds from the Pharmacy Assets sales of approximately $51 million at current inventory levels.

[AER A222].

---

[5] While the pharmacy asset sales described in this paragraph were entered into prior to the Petition Date, McKesson understands that certain of the transactions closed following the Petition Date. Ultimately, the parties will need to determine which of the pharmacies described in this paragraph had closings that occurred after the Petition Date and the value of the Reclamation Goods at these locations.

BN 38038816v4

**F.**     **Continuation of the Remainder of the Debtors' Business Operations, and Use of the Proceeds of the Reclamation Goods to Fund Their Bankruptcy Cases and Operations**

Following the Petition Date, Debtors continued to operate their businesses as debtors in possession.  Debtors began the bankruptcy cases with approximately 300 stores.  [AER A194].  During the "first day" hearing, Debtors obtained approval to close approximately 70 stores.  [AER A223].  Thereafter, Debtors continued to operate businesses, including the remaining stores and optical centers, which totaled approximately 230 locations.  On February 6, 2019, Debtors decided to close an additional 137 stores.  [AER A223].  Beginning in mid-March, 2019, Debtors closed the remaining stores and, in a separate transaction, sold their optical business.

Debtors needed to fund the operating costs for these business operations, along with the costs associated with the bankruptcy cases, such as professional fees.  Accordingly, as part of the DIP Financing Motion, Debtors sought authority to use cash collateral.  [AER A036].  According to the budget (the "DIP Budget") attached as Exhibit A to Debtors' post-petition financing agreement (the "DIP Agreement"), itself attached to the Final Order approving the DIP Agreement (the "Final DIP Order"), Debtors anticipated total receipts of over $530 million in the first 13 weeks of the cases.  Of that amount, Debtors anticipated that approximately $454 million would come from sales receipts, and over $84 million would come from the sale of

11

the Pharmacy Assets.  In addition, Debtors obtained authority to expend almost $400 million of their secured lenders' (the "Lenders") cash collateral in the first 13 weeks of their cases.  [AER A185].  Included in that total was over $30 million attributable to "restructuring related" expenses.  In other words, $30 million of the Debtors' assets were anticipated to be paid for the fees and costs of Debtors' professionals in the first 13 weeks of the cases.  [AER A185].

On February 6, 2019, Debtors filed an amended budget in connection with the DIP Agreement (the "Amended DIP Budget").  Under the Amended DIP Budget, Debtors anticipated total receipts of over $531 million during the first 13 weeks of the cases.  Of that amount, Debtors anticipated that approximately $481 million would come from sales receipts, and over $50 million would come the sale of the Pharmacy Assets.  From the $531 million of anticipated receipts, Debtors were authorized to use over $300 million of the Lenders' cash collateral in the operation of their businesses.  That $300 million amount includes $42 million for "restructuring related" expenses during the first 13 weeks of the cases.  The remaining approximately $217 million was allocated to pay down Debtors' obligation the Lenders. [AER A184].[6]  **Stated another way, and critical to McKesson's appellate issues, over $300 million of proceeds of the Pharmacy**

---

[6]     The DIP Budget and the Amended DIP Budget will be referred to collectively as the "Budgets."

**Assets and receipts from the sale of other goods were not paid to the Lenders.**
Again, given that much of Debtors' post-petition cash was generated from the sale
of the Reclamation Goods in connection with sales of the Pharmacy Assets and the
regular operation of its stores, the proceeds of some or all of the Reclamation Goods
were undoubtedly included in the amount expended by Debtors to fund operations
and pay the professionals employed in these cases (as opposed to paying the
Lenders).[7]

## G.    McKesson's Administrative Claim and the Scheduling Stipulation

In response to an initial administrative claims deadline established in the
cases, and as permitted in the Settlement Agreement, McKesson filed its Request for
Payment of Administrative Claim on March 29, 2019 (the "McKesson
Administrative Claim").  [AER A257].  The McKesson Administrative Claim was
filed in the amount of $36,190,535.08.  McKesson made clear that it sought payment
of the Administrative Claim in accordance with, and to the extent permitted by, the
Settlement Agreement.  [AER A260–61].  The McKesson Administrative Claim did
not include any amount owing to McKesson on account of its claim under
Bankruptcy Code section 503(b)(9).  Such amounts were instead included in
McKesson's proof of claim filed on March 15, 2019, and denominated as claim

---

[7]      While the Amended Budget is included in McKesson's concurrently filed AER, because
of its importance, a copy is attached to this brief for the Court's ready reference.

BN 38038816v4

number 1753-1 on the Court's claims register.   [AER A466].   The McKesson Administrative Claim is on account of McKesson's reclamation rights during the 21 day to 45 day prepetition period.

McKesson and Debtors filed their Stipulation for an Agreed Schedule Regarding McKesson's Asserted Administrative Claims on June 25, 2019 (the "Scheduling Stipulation") [AER A262].   Pursuant to the Scheduling Stipulation, determination of the McKesson administrative claim would be bifurcated.   The Bankruptcy Court would first hear and determine legal issues in connection with the claim (the "Initial Hearing").   Specifically, "the Initial Hearing shall only be on the legal issues relevant to McKesson's entitlement to assert and receive an allowed administrative claim and the necessary facts related thereto."  [AER A264].   To the extent the Bankruptcy Court determined that McKesson was legally entitled to assert an administrative claim on account of its reclamation rights, the parties were to agree on a schedule for discovery and an evidentiary hearing to adjudicate any factual issues requiring resolution (the "Second Hearing").   The Court entered its order approving the Scheduling Stipulation on July 3, 2019. [AER A266].

Pursuant to the Scheduling Stipulation, Debtors filed their Amended Objection to the McKesson Administrative Claim on July 12, 2019 (the "Amended Objection").   [AER A273].   In the Amended Objection, **Debtors did not allege, must less support by evidence, that all proceeds of the Reclamation Goods were**

14

**used to pay down the claims of the Lenders**.   McKesson filed its Resistance/Response to Amended Objection to Request for Payment of Administrative Claim on August 12, 2019.  [AER A300].  While the Scheduling Stipulation was clear that Debtors were not entitled to reply to McKesson's response, on the day of the hearing they nonetheless filed a document entitled "Summary of Debtor's Objections to McKesson's Reclamation Claim" (the "Objection Summary").  [AER A385].  Functioning as an improper reply, for the first time in the Objection Summary Debtors argued and provided some legal citations that McKesson was not entitled to an administrative claim under Bankruptcy Code section 503(b)(1)(A) because, according to Debtors, a post-petition transaction is a predicate to such a claim.   Because of the timing of the Objection Summary, McKesson was unable to brief this newly-asserted contention and provide the authority under which McKesson is entitled to hold an administrative claim under Bankruptcy Code section 503(b)(1)(A).   Instead, during the "Initial Hearing," McKesson advised the Bankruptcy Court that there was contrary authority to that set forth in the Objection Summary.  That authority is set forth below.

## H.    The Hearing and the Bankruptcy Court's Ruling

The Bankruptcy Court held the Initial Hearing on August 19, 2019.  At the hearing, McKesson's counsel argued, among other things, that McKesson was legally entitled to assert an administrative claim on account of its reclamation rights

because a significant portion of the proceeds of the Reclamation Goods was not paid to Debtors' secured Lenders, but instead went to fund Debtors' operations, including payment of their lawyers and financial advisors.  To show this, McKesson's counsel stressed the importance of the Budgets, which showed, as discussed above, that Debtors were authorized to use over $300 million for operations (including $42 million for their professionals during the first 13 weeks of the cases), and that only approximately $217 million went to pay down the Lenders.  [AER A437–38].  As summed up by McKesson's counsel:

> The money that came in from merchandise [sales], including the sale of pharmaceuticals in the ordinary course of Debtors' post-petition business, as well as the [pharmacy] asset sale proceeds did not go to the Lenders. They went for other purposes, and that's proven by the two budgets.

[AER A438–39].  Debtors never disputed this critical fact.

At the conclusion of the Initial Hearing, the Bankruptcy Court took the matter under advisement.  The Bankruptcy Court issued its Order Denying Request for Payment of Administrative Claim on August 30, 2019 (the "Denial Order").  [AER A453].  The Bankruptcy Court's reasoning for virtually every part of the Denial Order was based on the erroneous assumption that all of the proceeds of the Reclamation Goods were used to pay the Lenders, and that there was no value in those proceeds over and above what was paid to the Lenders.  Examples abound:

BN 38038816v4

- "Importantly, the *Pester* Court held that the reclamation claim [in that case] would be valueless if the prior secured lender's claim was satisfied by the reclamation goods or their proceeds." [AER A458];

- "In fact, the sale of the pharmacy assets was one of the first sources of payment toward the indebtedness owed to the Lenders and did not even come close to satisfying the total secured debt." [AER A458];

- "Since BAPCPA,[8] the case law is fairly consistent in holding that reclamation sellers are entitled to an administrative claim under 11 U.S.C. § 503(b)(9) (added by BAPCPA), but not under § 546(c), when a prior secured claim in excess of the goods exists." [AER A458];

- "The extinguishment of [McKesson's] reclamation rights happened when the goods were sold and no longer available for reclamation. Here, there is no doubt that the pharmacy sale proceeds (which included the reclamation goods) received by the estate shortly after the petition date did not satisfy the obligations owed to the Lenders. Therefore, the Reclamation Claims were valueless on the Petition Date and McKesson had no 'enforceable' reclamation rights at that time." [AER A459];

---

[8]     "BAPCPA" is shorthand for the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005.

BN 38038816v4

- "A key distinction between the relative positions of McKesson and the reclaiming creditor in *Reichold* is that the prior liens in *Reichold* were paid in full, leaving collateral available for the reclamation claims to attach to.  McKesson – and the Debtors – do not have that luxury here." [AER A461];

- "If there were any excess proceeds to which McKesson's reclamation rights could attach, McKesson's position may be valid.  However, as explained previously, there are not."  [AER A461]; and

- "The valueless reclamation claims (*supra*) resulting from the pre-petition delivery of goods on credit do not morph into valuable post-petition administrative priority claims simply because the goods were sold – in this case, for substantially less than what was owed to the secured lenders."  [AER A462].

The Bankruptcy Court erroneously **ignored the only evidence presented— the Budgets—**and their impact on the source of payment to the Lenders, and accordingly, on McKesson's legal reclamation rights.  Conversely, the Bankruptcy Court had before it **no evidence whatsoever that that all (or any portion) of the proceeds of the Reclamation Goods were paid to the Lenders**.  McKesson filed its Notice of Appeal of the Denial Order on September 12, 2019.  [AER A463].  The Bankruptcy Court also erroneously ignored a century of Eighth Circuit case law

18

awarding defrauded reclaiming sellers administrative, or de facto administrative, claims within the bankruptcy case.

## VI.
## SUMMARY OF ARGUMENT

The underlying question here is what happens when a buyer fraudulently induces a vendor to sell it goods on credit, ignores a seller's lawful reclamation demand, disposes of the goods during the course of its bankruptcy case, and uses the proceeds to operate its business and fund its reorganization. According to the Debtors and the Bankruptcy Court, nothing. They would leave the defrauded seller, in this case McKesson, holding a right without a remedy. Even common sense says that cannot be the result.

- McKesson is entitled to an administrative claim under Bankruptcy Code section 546(c). While an administrative claim may no longer be explicitly required under post-BAPCPA section 546(c), the Supreme Court teaches that amendments to the bankruptcy laws are not written on a clean slate. Instead, they must be viewed in light of pre-Code practice unless the legislative intent to vary from that practice is clear. With respect to reclamation claims, the pre-Code history, particularly in the Eighth Circuit, evidences a strong protection of reclamation rights, and a recognition that such protection will result in elevation of reclamation claims over those of general unsecured creditors. Further,

19

there is no hint in the legislative history regarding the BAPCPA amendment to section 546(c) that Congress intended to vary from pre-Code practice of awarding reclamation creditors administrative priority status.  Accordingly, McKesson is entitled to an administrative claim under section 546(c).

- Even if post-BAPCPA section 546(c) otherwise bars an administrative claim in exchange for lost reclamation rights, McKesson is entitled to such a claim because in connection with Debtors' sale of its pharmacy assets, all interests in those assets attached to the proceeds of sale.  As discussed in detail in Section VII.C. *infra*, former Nebraska Bankruptcy Judge Mahoney denied summary judgment to a debtor in an identical situation, recognizing that even in connection with post-BAPCPA section 546(c), a seller may assert a reclamation right and administrative status if its interests attached to the proceeds of the sale of its goods.

- McKesson is entitled to an administrative claim under Bankruptcy Code section 503(b)(1)(A).  Debtors used the proceeds of goods in which McKesson held a reclamation interest to fund their postpetition operations as well as their reorganization expenses (including professional fees).  In other words, the proceeds were used for the actual

and necessary expenses of the estates.  Indeed, Debtors have admitted that they "undoubtedly" received a postpetition benefit from selling goods otherwise subject to reclamation rights.  Accordingly, McKesson is entitled to an administrative claim in connection with the reclamation goods under Bankruptcy Code section 503(b)(1)(A).

- The Bankruptcy Court erred procedurally because it did not follow the process provided for in the Scheduling Order.  First, with no evidence, (and in the face of countervailing evidence) the Bankruptcy Court merely assumed that all of the proceeds of the Reclamation Goods went to pay down the obligations to the Lenders.  Second, if the Bankruptcy Court believed (as it apparently did) that use of the proceeds of the Reclamation Goods to pay down the Lenders was factually determinative, it should have reserved that issue for a Second Hearing, at which the Bankruptcy Court could determine, following discovery and an evidence, what portion, if any, of the proceeds went to the Lenders.

BN 38038816v4

## VII.
## ARGUMENT

**A.    The Eighth Circuit's Strong Protection of Reclamation Rights Has its Roots in the Earliest Formulations of Our Common Law**

"Reclamation is the right of a seller to recover possession of goods delivered to an insolvent buyer.  It is a recessional remedy, based on the theory that the seller has been defrauded."  *In re Pester Ref. Co*., 964 F.2d 842, 844 (8th Cir. 1992). "Reclamation is a potentially powerful remedy" for the benefit of a seller of goods on credit.  L. Garvin, *Credit, Information, and Trust in the Law of Sales: The Credit Seller's Right of Reclamation*, 44 UCLA L. Rev. 247, 250 (1996) (citations omitted). "And, unsecured trade credit is vital to our economy:  at any moment there are roughly one trillion dollars of unsecured trade debt outstanding in the United States." *Id*.

"Reclamation is at some level an old remedy, with roots in Roman law.  In its modern form, though, it is a relatively recent creature of the English Common law of fraud . . . ."  *Id*. at 254.  As noted by Garvin,

> The common-law remedy of reclamation was robust.  It afforded the seller a strong right against virtually all parties save good faith purchasers for value (a term rather narrowly defined) and extended to the proceeds of the goods.  Moreover, the matter of proof was not generally difficult; there was no need to establish intent when the buyer was hopelessly insolvent or a false representation was relied on.

*Id.* at 261 (citations omitted).  Recognizing the vitally important role of reclamation, Uniform Commercial Code section 2-702(2) was "the first attempt to codify the seller's right to reclaim goods from an insolvent buyer."  J. Cook, *Section 2-702(2): A Seller's Prima Facie Case and the Obligation of Good Faith*, 10 B.C. L. Rev. 634, 634 (1969).

Continuing this long history, the Eighth Circuit has uniformly protected sellers' reclamation rights and recognized their entitlement to be paid as administrative or de facto administrative creditors in bankruptcy cases.  The first reported Eighth Circuit decision on this subject is *Gillespie v. J.C. Piles & Co.*, 178 F. 886 (8th Cir. 1910).  In *Gillespie*, the day before the bankruptcy filing, the debtor took possession of nine carloads of hogs.  *Id.* at 888.  The next day, the bankruptcy receiver sold the hogs, including those sold to the debtor by the reclaiming/rescinding vendors.  *Id.*  The vendors demanded the proceeds of the hogs.  *Id.*  On appeal, the Eighth Circuit affirmed the Iowa District Court's ruling that the proceeds of the hogs be paid to the vendors.  *Id.* at 891.  In sum, the Eighth Circuit affirmed giving the reclaiming seller a de facto administrative priority claim in the buyer's bankruptcy case.

Fifty years later, in 1961, the Eighth Circuit again addressed reclamation claims in the context of a bankruptcy case—this time for shoes sold to a retail debtor on the eve of bankruptcy.  *O'Rieley v. Endicott-Johnson Corp.,* 297 F.2d 1 (8th Cir.

1961).  In *O'Rieley*, relying on false financial statements, the vendor sold shoes on credit to the debtor.  *Id.* at 2.  Once the bankruptcy petition was filed, the seller made a reclamation demand.  *Id.*  By agreement, the trustee sold the shoes.  *Id.*  On appeal, the Eighth Circuit affirmed the vendor's reclamation demand.  *Id.* at 9.  In ruling in favor of the reclaiming seller and the seller's entitlement to the sale proceeds of the reclaimed goods (thereby giving the reclaiming seller a de facto administrative priority claim), future Supreme Court Justice Blackmun aptly stated that:

> While we realize that a decision in favor of [the seller] has the practical effect . . . of favoring one creditor over the general creditors, this is necessarily true of any successful reclamation petition.  **It would be unjust to permit general creditors to benefit at the expense of one whose assets come into a bankrupt's possession under conditions which warrant recession**.

*Id.* (emphasis added).  These words written by Justice Blackmun nearly 60 years ago apply with equal force in this case.

Almost two decades later, in 1978, the Eighth Circuit again addressed reclamation rights - this time in the context of furniture.  *Bassett Furniture Indus., Inc. v. Wear* (*In re PFA Farmers Market Assoc.*), 583 F.2d 992 (8th Cir. 1978).  In *PFA Farmers Market*, just before bankruptcy the seller delivered furniture on credit to the debtor.  *Id.* at 993.  Immediately upon learning of the bankruptcy petition, the seller sent a reclamation demand under UCC § 2-702(2).  *Id.*  Both the bankruptcy judge and the district court rejected the reclamation demand.  *Id.* at 994.  On appeal,

the Eighth Circuit reversed. *Id*. at 993. The *PFA Farmers Market* panel ruled that a bankruptcy trustee could not use its status as hypothetical lien creditor to wipe out the seller's reclamation right: "We favor this analysis because . . . it is consistent with the most common understanding of the purpose of § 2-702(2) to simplify and expand the seller's right to reclaim." *Id*. at 1000.

Expanding on Justice Blackmun's words in *O'Rieley*, the *PFA Farmers Market* panel noted:

> Section 2-702 is not an attempt to elevate a group of creditors that have historically found themselves in the general distribution of a bankrupt's estate. It is the exclusive substitute for the long respected right to reclaim. Viewed realistically, it is no more objectionable to bankruptcy policy than its pre-Code antecedent, which we sustained without qualm under the 1952 legislation. Given the short-lived nature of the right to reclaim, the fact that the remedy is limited to the specific goods delivered to the insolvent buyer . . . we think it likely that Congress continues to prefer the equities of sellers under § 2-702(2) to those of general creditors for much the same reasons that it permitted a seller to reclaim under pre-Code law.

*Id*. at 1003 (footnotes and citations omitted).[9] Like the sellers in *Gillespie* and *O'Rieley*, the reclaiming seller in *PFA Farmers Market* also was granted a de facto administrative priority claim.

---

[9]   McKesson acknowledges that within this quote there is a reference to secured creditors and their ability to protect themselves. But, because the Lenders consented to the use of cash collateral, including all or a portion of the proceeds of the Reclamation Goods, this language is not relevant here.

Eight years after issuing the *PFA Farmers Market* ruling, the Eighth Circuit again addressed reclamation claims, but this time under the Bankruptcy Code. *In re Griffin Retreading Co*., 795 F.2d 676 (8th Cir. 1986). In *Griffin*, a seller issued a reclamation demand for rubber delivered on the eve of bankruptcy. *Id*. at 677. While acknowledging the reclamation demand, the bankruptcy court denied the seller an administrative claim because the debtor had sold the rubber during the bankruptcy case in the ordinary course of its business. *Id*. at 679. The district court reversed and held the seller was entitled to an administrative claim for the value of the reclaimed goods. *Id*. at 677. On appeal, the Eighth Circuit affirmed that ruling— *i.e*., the grant of an administrative claim to the reclaiming seller. *Id*. at 680.

The *Griffin* court noted that "to order reclamation where such is impossible to obtain is **to acknowledge a right without a remedy**." *Id*. at 679 (emphasis added). In ruling in favor of the seller, the Eighth Circuit noted:

> The granting of an administrative claim under § 546(c)(2)(A) is not inconsistent with the right to reclaim, but supplements that right. It provides additional protection to a seller who has delivered goods to a bankrupt debtor on the eve of the bankruptcy. It provides flexibility to the bankrupt estate by permitting the use of the property, if needed for the successful completion of the plan of reorganization. In such case the seller is protected without placing the plan in jeopardy.

*Id*. These same guiding principles apply to this matter.

Notably, in *Griffin Retreading*, the Eighth Circuit expressly declined to address the interests of the secured creditor. *Id*. at 680. The Eighth Circuit refused to do so because the dispute over the administrative claim was only between the seller and the debtor, and not the secured creditor. *Id*. Likewise, in this matter, the allowance of McKesson's administrative claim on account of its reclamation right is a dispute only between McKesson and Debtors. The Debtors' Lenders have no involvement in this matter. They have been paid in full.

The most recent in the century-long line of Eighth Circuit reclamation cases protecting the rights of reclamation creditors in bankruptcy cases and granting administrative priority status is *In re Pester Refining Co*., 964 F.2d 842 (8th Cir. 1992). In *Pester*, the seller delivered a trainload of gasoline additives on the eve of bankruptcy. *Id*. at 844. Two days after the petition, the seller transmitted a reclamation demand. *Id*. The debtor argued that the mere presence of secured creditors (owed $42 million) with superior rights extinguished a vendor's right of reclamation. *Id*. at 845-846. The panel disagreed, noting that:

> [T]his contention does obvious violence to the statutory language. **In the UCC context, when the right to reclaim is "subject to" the rights of secured creditors, that means that the right is subordinate or inferior to the security interests, not that it is automatically and totally extinguished.** Therefore, after the secured creditors' superior interests have been satisfied or released, the reclaiming seller retains a priority interest in any remaining goods . . . .

27

*Id.* at 846 (emphasis added). Yet again, the Eighth Circuit upheld reclamation rights and protected the reclaiming seller by affirming the grant of an administrative claim for the value of the reclaimed goods.

Despite the century-long unbroken history of awarding administrative priority claims and de facto administrative priority treatment to reclaiming sellers, the Bankruptcy Court ignored all of the Eighth Circuit cases except *Pester,* which, as discussed below, it wrongly distinguished from this case.

**B.** **McKesson Is Entitled to an Administrative Claim under Bankruptcy Code Section 546(c)**

As discussed above, pursuant to section 2. of the Settlement Agreement, McKesson retained any rights it had "under the Bankruptcy Code or applicable law to assert a claim and file a proof of claim for reclamation with respect to" its reclamation rights under Bankruptcy Code section 546(c). McKesson is entitled to such a claim as an administrative expense.

**1.** **The Effect of the BAPCPA Amendments to Section 546(c)**

In the Amended Objection, Debtors tried to make much of the fact that after BAPCPA, Bankruptcy Code section 546(c) no longer contains an explicit requirement that a court grant an administrative claim if it denies reclamation to a seller. Yet, the BAPCPA revision does not prevent the Court from granting McKesson an administrative claim on account of destroyed reclamation rights. This

28

conclusion follows from Supreme Court teaching about how amendments to existing bankruptcy laws must be interpreted.

In *Dewsnup v. Timm*, 502 U.S. 410 (1992).  The Supreme Court stated that:

> When Congress amends the bankruptcy laws, it does "not write on a clean slate."  Furthermore, this Court has been reluctant to accept arguments that would interpret the Code, however vague the particular language under consideration might be, to affect a major change in pre-Code practice that is not the subject of at least some discussion in the legislative history.

*Id*. at 419, fn. 4 (citations omitted).  In *Dewsnup*, the Court affirmed the pre-Code practice that valid liens pass through bankruptcy unaffected, notwithstanding Bankruptcy Code section 506(d), which appears to strip liens under certain conditions.  The Court noted that the effect of Section 506(d) in relation to the other provisions of section 506 ". . . embrace[s] some ambiguities . . . ."  *Id*. at 416.  Further, "given the ambiguity in the text, we are not convinced that Congress intended to depart from the pre-Code rule that liens pass through bankruptcy unaffected."  *Id*. at 417.

The Eighth Circuit recently faced a similar issue in *Shelton v. Citimortgage, Inc.* (*In re Shelton*), 735 F.3d 747 (8th Cir. 2013).  In *Shelton*, the debtor argued that a creditor's lien was void under Bankruptcy Code section 506(d) because the creditor late-filed its proof of claim.  *Id*. at 748.  While section 506(d) provides an exception for the failure to file a proof of claim, it does not, at least facially, provide an

29

exception if a claim is late-filed.  Both the bankruptcy court and the Eighth Circuit

BAP sided with the creditor.  *Id*. at 747.  On appeal to the Eighth Circuit, the panel

acknowledged the superficial appeal of the debtor's plain text support for its

position.  *Id*. at 748.  The panel also noted:

> *Dewsnup* is material to our analysis because it finds
> ambiguity in § 506 and because it rests on two important
> considerations:  (1) Bankruptcy Code provisions should
> not be read in isolation from one another; and (2) they
> should not be read in isolation from pre-Code practices.

*Id.* at 749 (citing *Dewsnup*, 502 U.S. at 419).  Accordingly, the panel rejected the

debtor's "superficially appealing, but ultimately inequitable and isolated, reading of

§ 506(d)."  *Shelton*, 735 F.3d at 750.[10]

The same principles apply here.  Prior to BAPCPA, Bankruptcy Code section

546(c) required that a bankruptcy court provide an administrative claim to a claimant

who timely made its reclamation demand but was denied reclamation of its goods.

Pre-BAPCPA § 546(c)(2).  The time period within which a vendor must have

demanded reclamation was tight—before 10 days after receipt of the goods by the

debtor, or if the 10 day period expired after commencement of the case, 20 days after

receipt of the goods.  Pre-BAPCPA § 546(c)(1).

---

[10]    The rule articulated by the Supreme Court in *Dewsnup* is identical to the rule regarding abrogation of common law outside of the bankruptcy context.  *See U.S. v. Texas*, 507 U.S. 529 (1993) (recognizing longstanding  principle that statutes which invade the common law are to be read with a presumption favoring the retention of long-established and familiar principles, except when a statutory purpose to the contrary is evident.).

30

BAPCPA overhauled the structure. The post-BAPCPA 546(c) expanded from 10 days to 45 days the time within which a reclamation demand must be made. In addition, a seller is entitled to an administrative claim pursuant to section 503(b)(9) for goods delivered within 20 days of the commencement of the case regardless of whether the seller timely made a reclamation demand and irrespective of whether the seller holds a valid reclamation claim for those goods.[11] BAPCPA also removed the requirement that a bankruptcy court grant an administrative claim to a seller who timely made its reclamation demand but was denied reclamation of its goods.

Like in *Dewsnup* regarding section 506(d), section 546(c) "embrace[s] some ambiguities." 502 U.S. at 416. For example, while a seller is entitled to an automatic administrative claim for goods delivered within 20 days of the bankruptcy case whether or not it made appropriate demand and irrespective of the 10-day time period of UCC § 2-702(2), what happens regarding goods delivered within the 21 to 45 day period where, like here, a seller does make appropriate demand but is denied reclamation of its goods? There is certainly nothing in the legislative history indicating that Congress intended to leave such a seller without a remedy in exchange for its lost reclamation rights, which are recognized within Bankruptcy

---

[11]   UCC section 2-702(2) only covers a 10-day period following delivery (assuming no misrepresentation of solvency). Bankruptcy Code section 503(b)(9) grants an automatic administrative claim for goods delivered to a debtor within 20 days of a petition date. While there may be overlap between these two rights (reclamation claims under the UCC versus administrative claims under section 503(b)(9)), they are not the same.

BN 38038816v4

Code section 546(c). As described in the legislative history to section 546(c) under

BAPCPA:

> Section 1227 of the [2005] Act amends section 546(c) of
> the Bankruptcy Code to provide that the rights of a trustee
> . . . are subject to the rights of a seller of goods to reclaim
> goods sold in the ordinary course of business to the debtor
> if (1) the debtor, while insolvent, received the goods not
> later than 45 days prior to the commencement of the case,
> and (2) written demand for reclamation of the goods is
> made not later than 45 days after receipt of such goods by
> the debtor . . . . If the seller fails to provide notice in the
> manner provided in this provision, the seller may still
> assert the rights set forth in section 503(b)(7)[12] of the
> Bankruptcy Code.

H. R. No. 109-31, pt. 1, 109th Cong., 1st Sess.146 (2005).

Moreover, the post-BAPCPA amendment to section 546(c) was not "written

on a clean slate." *Dewsnup*, 502 U.S. at 419. And, as *Dewsnup* warned, the Court

should not "accept arguments that would interpret the Code, however vague the

particular language under consideration might be, to affect a major change in pre-

Code practice that is not the subject of at least some discussion in the legislative

history." *Id*. Adoption of Debtors' view would be just such a major change in pre-

Code practice. As discussed in detail above, the reclamation slate goes back to

ancient times, through pre and post-Code practice. The pre-Code practice of

granting reclaiming sellers administrative claims is set forth in three separate Eighth

---

[12]    Section 503(b)(7) was later re-enumerated as section 503(b)(9).

Circuit pre-Code decisions spanning nearly seventy years—from 1910 through 1978. The primary theme throughout that long history is unwavering: reclamation rights must be protected and if the goods are sold during the course of the bankruptcy case, the reclamation creditor is entitled to something more than mere treatment as an ordinary creditor—*i.e.*, administrative treatment.

The Court need look no further than Eight Circuit jurisprudence to determine pre-Code law and practice. As far back as 1910 in *Gillespie*, the Eighth Circuit awarded the aggrieved seller an administrative claim for the value of the reclaimed hogs. 178 F. at 893. In other words, the seller's rights were elevated above ordinary creditors. In 1961, Justice Blackmun was even more explicit in *O'Rieley*, in upholding the grant administrative priority to a reclaiming seller of shoes:

> **While we realize that a decision in favor of [the seller] has the practical effect . . . of favoring one creditor over the general creditors, this is necessarily true of any successful reclamation petition.** It would be unjust to permit general creditors to benefit at the expense of one whose assets come into a bankrupt's possession under conditions which warrant recession.

297 F.2d at 9 (emphasis added). Even after the Bankruptcy Code was enacted in 1978, this Eighth Circuit jurisprudence and practice continued. As the Eighth Circuit noted in *Griffin* in affirming the reclaiming seller's administrative claim, "to order reclamation where such is impossible to obtain is to acknowledge **a right without a remedy**." 795 F.2d at 679 (emphasis added). This outcome was acknowledged in

*In re Reichold Holdings US, Inc.* 556 B.R. 107, 109 (Bankr. D. Del. 2016) (a very recent, post-BAPCPA case), where the vendor filed an administrative claim for the value of goods delivered to the debtor between days 21 and 45 prepetition. The debtor objected to the claim on the ground that its secured lender's interest in the goods rendered the reclamation claim valueless. *Id.* The *Reichold* court overruled the objection and, subject to proving up its reclamation claim in accordance with section 546 and state law, allowed an administrative claim for the value of the goods delivered during the 21 to 45 day pre-petition window. *Id.* at 112, fn. 5.

In sum, post-BAPCPA section 546(c) must be viewed in light of historical reclamation practice and the protections granted to reclaiming sellers (i.e., administrative priority status), particularly where, as here, there is no discussion whatsoever in the legislative history to evidence Congressional intent to change this jurisprudence. Accordingly, the mere fact that post-BAPCPA 546(c) no longer **requires** a court to grant an administrative clam is a far cry from a conclusion that reclaiming seller **may not** receive an administrative claim when its goods are sold during the bankruptcy case.[13]

---

[13]   Debtors' argument also flies in the face of a fundamental stabilizing canon of statutory interpretation—the presumption against implied repeal. "The essence of the presumption against implied repeals is that if statutes are to be repealed, they should be repealed with some specificity." A. Scalia and B. Garner, *Reading Law: The Interpretation of Legal Texts*, 1st ed. 2012. Repeal by implication is very much disfavored. *See U.S. v. Noce*, 268 U.S. 613, 619 (1925). As discussed above, post-BAPCPA section 546(c) should not be read to repeal of a reclamation claimant's right to an administrative claim particularly where there was no mention of that, let alone mention with specificity, in the legislative history. Moreover, if Debtors are correct, post-BAPCPA section

The Bankruptcy Court largely ignored McKesson's argument about pre-Code practice and the proper interpretation of post-BAPCPA section 546(c), focusing instead on *Reichold*.  The Bankruptcy Court stated that

> A key distinction between the relative positions of McKesson and the reclaiming creditor in *Reichold* is that the prior liens in *Reichold* were paid in full, leaving collateral available for the reclamation claims to attach to. McKesson – and the Debtors – do not have that luxury here.

[AER A461].   Aside from not addressing McKesson's statutory interpretation argument, the Bankruptcy Court's "key distinction" was based on an erroneous (or at least unfounded) assumption.   As mentioned above, there was no evidence demonstrating that all of the Reclamation Goods proceeds went to pay the Lenders. To the contrary, the Budgets prove that some portion of the proceeds from the Reclamation Goods went to fund Debtors' operations and reorganization expenses. To the extent that such proceeds did not go to pay the Lenders, they were available for attachment by McKesson's reclamation claims.

## 2.     McKesson Holds a Valid Reclamation Claim

Bankruptcy Code section 546(c) provides that a seller of goods to an insolvent debtor in the ordinary course of the seller's business may reclaim such goods received by the debtor within 45 days of the petition date, so long as, among other

---

546(c) also repeals section 503(b)(1)(A) allowing administrative claims for the actual and necessary expenses of the estate, at least for reclamation creditors.   Surely, there was no Congressional intent of that result, specified or otherwise.

things, the seller demands reclamation in writing not later than 45 days after the debtor's receipt of such goods.   Section 546(c), however does not create an independent federal right of reclamation, "rather, it permits an exception to the trustee's strong arm powers if the seller has a right of reclamation under state law." *Reichold*, 556 B.R. at 110.

Under Wisconsin law, a seller has a right to reclaim goods sold so long as (1) the buyer received the goods on credit; (2) the buyer received the goods while insolvent; and (3) the seller learns of the buyer's insolvency and makes demand for return of the goods.   Wis. Stat. ¶ 402.702(2); *see also Pester*, 964 F.2d at 844.

McKesson meets all of the requirements for a valid and enforceable right of reclamation.   There is no dispute that McKesson sold goods to Shopko Stores on credit in the ordinary course of McKesson's and Shopko Stores' business.   Likewise, there is no dispute that Shopko Stores received the goods while it was insolvent. Moreover, as demonstrated above, McKesson timely took every possible action to demand, preserve, and protect its reclamation rights.

McKesson transmitted the Reclamation Demand Letter on December 30, 2018, 17 days before the Petition Date.   Then, McKesson took further steps to protect its reclamation rights.   After Shopko Stores failed to comply with the Reclamation Demand Letter, McKesson filed the Complaint in the Wisconsin State Court seeking to enforce its reclamation rights.   Along with the Complaint, McKesson filed the

36

TRO Motion seeking an order prohibiting Shopko Stores from selling, moving, relocating, or destroying any Pharmaceutical Goods delivered by McKesson to any of Shopko Stores' stores on or after November 11, 2018.  On the same day Debtors commenced their bankruptcy cases and before the "first day" hearing, McKesson filed the McKesson DIP Objection, through which McKesson spelled out its reclamation rights and prepetition demands, objected to the proposed DIP financing to the extent that it impaired McKesson's reclamation rights.  McKesson appeared at the "first day hearing," and sought adequate protection of those rights.  At the "first day hearing" in these cases, McKesson also objected to the Pharmacy Sale Motion to the extent that it impaired McKesson's reclamation rights.  Finally, McKesson entered into the Settlement Agreement, further protecting its reclamation rights.

In the Amended Objection, Debtors argued that because McKesson's reclamation rights were subject to a prior security interest, McKesson did not hold a valid reclamation claim.  Debtors were wrong for two reasons.  First, as discussed above, controlling Eight Circuit law is clear that while reclamation rights may be **subject to** prior security interests, they are **not extinguished** thereby.  *Pester*, 964 F.3d at 846.  Other courts agree.  *See e.g. Reichold Holdings*, 556 B.R. at 110, decided after Bankruptcy Code section 546(c) was amended to clarify that reclamation rights are subject to the prior rights of lienholders ("The mere presence

of a secured creditor with superior rights . . . does not extinguish a vendor's reclamation rights."); *U.S. v. Westside Bank*, 732 F.2d 1258, 1265 (5th Cir. 1984) (reclaiming vendor entitled to priority status over general unsecured creditors when all prior lienholders have been fully satisfied.  Further, such a vendor's priority extends to traceable proceeds of the goods.).

In *Pester,* the panel rejected the same argument Debtors make here.  In *Pester*, the debtor argued the secured creditors were undersecured and, thus, the reclamation claim was worthless.  964 F.3d at 847.  The Eighth Circuit disagreed:

> [I]f the secured creditor releases its security interest in the goods to be reclaimed, the seller may enforce its right to reclaim, even if the resulting reduction in the buyer's assets impairs the secured creditor's position.  In other words, in the non-bankruptcy context, the secured creditor's decision with respect to its security interest in the goods will determine the value of the seller's right to reclaim.

*Id*. at 847.  Likewise here, by permitting Debtors to use over $300 million of their cash collateral to fund the professionals and other Chapter 11 operating expenses, the Lenders released their security interest in those assets.  As was the result in *Pester*, the Lenders' release of its security interest results in McKesson's entitlement to an administrative claim for the value of its reclamation claim.

In *Pester*, the Eighth Circuit also examined the confirmed plan to determine whether the seller's reclamation claim was worthless.  Under the *Pester* plan, the secured creditors' claim was not satisfied from the proceeds of the reclaimed goods.

38

964 F.3d at 848–49.  Similarly, here, under the confirmed Plan, the Lenders' claims were not satisfied from the proceeds of McKesson's reclaimed goods.  Those proceeds had already been used by the Debtors (following the Lenders' release of their liens therein) to fund the costs of their operating and reorganization expenses.  Thus, McKesson's reclamation claim is not, and was not, valueless and McKesson is entitled to an administrative claim for the value of the goods delivered between 21 and 45 days before the Petition Date.

The Bankruptcy Court dismissed McKesson's argument, and the impact of *Pester,* again based on an erroneous assumption—that all of the pharmacy asset proceeds went to pay the Lenders.  As the Bankruptcy Court stated, "importantly, the *Pester* court held that the reclamation claim 'would be valueless' if the prior secured lender's claim was satisfied by the reclamation goods or their proceeds." [AER A458].  Moreover, "in fact, the sale of the pharmacy assets was one of the first sources of payment toward the indebtedness owed to the lenders, and did not even come close to satisfying the total secured debt."  [AER A458].  As discussed above, no such evidence was presented to the Bankruptcy Court.  Conversely, the only evidence presented on the issue—the Budgets—prove that significant sums were used by Debtors to operate their businesses and pay their lawyers and accountants.

In addition, the Bankruptcy Court ignored the fact that Lenders permitted the use of their cash collateral (including at least some of the proceeds of the

BN 38038816v4

Reclamation Goods) to fund the Debtors' operations and reorganization expenses. Again, the Lenders necessarily released their liens on that cash. As was the result in *Pester*, the Lenders' release of their liens resulted in value to which McKesson's reclamation rights could attach, and accordingly, McKesson's right to an administrative claim. The Court should reverse the Bankruptcy Court and hold that McKesson is entitled to an administrative claim under Bankruptcy Code section 546(c). Absent outright reversal, the Court should remand with instructions to hold the Second Hearing to determine the factual issues.

## C.   <u>Even if Post-BAPCPA Section 546(c) Generally Prohibits an Administrative Claim, the McKesson Administrative Claim Fits into an Exception to the General Rule</u>

In *In re Professional Veterinary Products, Ltd*., 454 B.R. 479 (Bankr. D. Neb. 2011), while holding that post-BAPCPA 546(c) does not ordinarily extend a seller's right to assets other than the actual goods, **the court made a critical exception in that case**. The reclaiming seller argued that a prior court order approving the sale of the debtor's assets protected the seller's interest in the reclaimed goods even though the goods were sold. *Id.* at 484. The order approving the sale provided that all interests in the goods sold would attach to the proceeds of the sale. *Id.* Interests were defined broadly to include, among other things, liens, pledges, security interests, claims, demands and interests of any kind or nature in the goods sold. *Id*.

As the *Professional Veterinary* court noted, "this definition of 'interests' seems broad enough to include reclamation demands." *Id.* In denying the debtor's motion for summary judgment, the *Professional Veterinary* court concluded that:

> The debtor is correct in its assertion that the present version of § 546(c) does not provide for a lien on proceeds, **but by using language in the sale order indicating that [the seller's] interest, if any, in the inventory would be transferred to the proceeds, the debtor opened the door to allowing for that possibility**.

*Id.* at 486 (emphasis added).

And so it is here. As discussed above, pursuant to the Pharmacy Sale Order, the Pharmacy Assets were sold free and clear of all interests, with interests in the Pharmacy Assets attaching to the proceeds of sale. Pursuant to the Sale Motion, the term "interests" included all liens, claims, rights, interests, charges, and encumbrances. Like in *Professional Veterinary*, this definition of "interests" encompasses reclamation claims. Accordingly, also like in *Professional Veterinary*, even if the Court believes that post-BAPCPA section 546(c) does not provide for an interest in proceeds or allow for an administrative claim to the reclaiming seller, by including language in the Pharmacy Sale Order indicating that McKesson's interest in the Reclamation Goods would attach to the proceeds of the Pharmacy Assets, Debtors acceded to the allowance of an administrative claim on account of valid reclamation claims.

The Bankruptcy Court recognized the *Professional Veterinary* exception: "[i]f there were excess proceeds to which McKesson's reclamation rights could attach, McKesson's position may be valid."  [AER A461].  The Bankruptcy Court then dismissed the exception for McKesson, again concluding that there were no excess proceeds to which McKesson's right could attach after payment of the Lenders. [AER A461].  Again, the Bankruptcy Court was wrong.  As discussed above, the Lenders permitted a substantial portion of the proceeds of the Reclamation Goods to pay for Debtors' operations and reorganization expenses.  By permitting such use of its cash collateral, the Lenders' released their liens on those proceeds.  That created excess proceeds to which McKesson's rights attached pursuant to the Pharmacy Sale Order.  Again, the Bankruptcy Court should have allowed the issue to proceed to the second phase of the process—a factual determination of the amount of Reclamation Goods proceeds that were not used to pay the Lenders, but instead to fund Debtors' operations and their reorganizations.

## D.      McKesson Is Entitled to an Administrative Claim under Bankruptcy Code Section 503(b)(1)(A)

As mentioned above, for the first time in the Objection Summary, Debtors argued that McKesson was not entitled to an administrative claim under Bankruptcy Code section 503(b)(1)(A) because, according to Debtors, a post-petition transaction is a predicate to such a claim.  Section 503(b)(1)(A) requires a bankruptcy court to

42

allow an administrative expense claim for the "the actual and necessary expenses of preserving the estate."  Without allowing any briefing on the issue, or any meaningful opportunity for McKesson to respond to the argument and cases cited by Debtors in the Objection Summary, the Bankruptcy Court rejected the possibility that McKesson could be entitled to an administrative claim under section 503(b)(1)(A), ruling that an administrative claim can only arise in connection with a post-petition transaction between a debtor and a creditor. [AER A460–61].  That is simply not true.  In fact, an exception to the requirement of a post-petition transaction was created by the Supreme Court in *Reading Co. v. Brown*, 391 U.S. 471, 475 (1968).

In *Reading*, prior to the enactment of the current Bankruptcy Code, the Supreme Court interpreted section 64a of the Bankruptcy Act, which read: "The debts to have priority . . . shall be (1) the costs and expenses of administration, including the actual and necessary costs and expenses of preserving the estate subsequent to filing the petition."  Before the bankruptcy case was commenced, a receiver was appointed to conduct the debtor's business—leasing an industrial building.  Under the receiver's watch, the building was destroyed by fire.  *Id*. at 473. After a bankruptcy case was commenced, the Supreme Court determined that the tort claim arising from the receiver's negligence qualified as an administrative expense and was entitled to priority.  *Id*. at 483–85.  The Supreme Court balanced

the equities of a debtor's rehabilitation against the desirability for those injured by the debtor's operation to recover ahead of those who benefitted from the debtor's operations, and concluded that the tort claim qualified as an administrative expense. Thus, the Supreme Court created an exception to the general rule that administrative expenses must arise from a post-petition transaction with the bankruptcy estate. *Id.*

The Eighth Circuit recognized the exception in connection with an asserted administrative claim under the Bankruptcy Code. In *Sanchez v. Northwest Airlines, Inc.*, 659 F.3d 671, 677–78 (8th Cir. 2011) the panel explained that "*Reading* represents a limited exception to the general rule that to fit within § 503(b), expenses must (a) confer 'an actual and demonstrable benefit [on] the debtor's estate, the creditors, and to the extent relevant, the stockholders,[14] and arise from a transaction with a bankruptcy estate." *Id.* (internal citations omitted). Other courts have recognized that under *Reading* "fundamental fairness may, in appropriate circumstances, demand that a party injured in some manner by the administration of the estate be compensated pursuant to section 503." *Corporate Assets, Inc. v. Paloian*, 368 F.3d 761, 773 (7th Cir. 2004); *see also In re Munce's Superior Petroleum Prods.*, 736 F.3d 567, 572 (1st Cir. 2013) (applying *Reading* to award an

---

[14]   Debtors admitted that they received a postpetition benefit from the sale of the Reclamation Goods. In their Omnibus Surreply to Replies of Landlords Regarding the Initial Legal Issues [AER A294], Debtors stated that ". . . a debtor and its estate undoubtedly receive a postpetition benefit from selling goods that were delivered outside the 503(b)(9) window**.**" [AER A297–98).

44

administrative claim for fines based on post-petition violations of a pre-petition injunction); *In re ZiLOG, Inc*., 450 F.3d 996, 999 n.1 (9th Cir. 2006) (noting that *Reading* applies to discrimination claims).

In *In re Alan Wood Steel Co*., 2 B.R. 161 (Bankr. E.D. Pa. 1980), a bankruptcy court applied the *Reading* exception to allow an aggrieved reclamation claimant to assert an administrative claim.  The court viewed a debtor's refusal to turn over property to a reclaiming creditor as akin to post-petition conversion or trespass to chattel.  While the creditor in that case did not meet the test for such torts under applicable state law, the point is that the court recognized that the *Reading* exception can result in an administrative claim for a reclaiming seller that delivered goods to a debtor pre-petition.  As stated by the court:

> Since [the creditor's] claim is essentially a damage claim arising out of tortious trespass to chattels . . . we have no problem in applying *Reading* to the facts here.  [The creditor] argues that the claims should be allowed as administrative expenses because the intent of the receiver was to preserve the estate for the benefit of the debtor's creditors.  Thus, it reasons, the damages should be equitably borne by the estate.  On the rationale of *Reading*, however, we would take this argument even further.  The Court there did not apparently deem it necessary to find that the receiver's negligence in causing fire damage to adjacent property came out of efforts to preserve the estate.  The nature of the tort claim, regardless of the receiver's intentions, may give rise to an administrative expense.

*Id*. at 163.

Even without the *Reading* exception, an administrative claim can arise absent a post-petition transaction where a debtor uses property in which another party holds an interest.  In fact, in *In re Houlihan's Restaurant*, 286 B.R. 137, 138–40 (Bankr. W.D. Mo. 2002), the court acknowledged that a reclamation creditor could satisfy the requirements of section 503(b)(1)(A) and be entitled to an administrative claim on account of its reclamation rights.  The court, however, found that the claim had no value because a secured creditor's lien in the goods exceeded the value of the goods.  As discussed above, for a variety of reasons, that impediment does not exist here.  Other courts have also allowed administrative claims in the absence of a post-petition transaction.  For example, in *In re Shreyas Hospitality, LLC*, 2010 Bankr. LEXIS 2074 (Bankr. C.D. Ill. 2010), a franchisor was entitled to an administrative claim under section 503(b)(1)(A) to compensate it for the debtor's use of its trade name during the pendency of the case.  Similarly, a lessor under a prepetition lease is entitled to an administrative claim on account of a debtor's postpetition use of the leased property.  *See e.g.*, *In re Peninsula Gunite, Inc.*, 24 B.R. 593 (B.A.P. 9th Cir. 1982).

Here, to the extent proceeds of the Reclamation Goods were used to fund Debtors' operations and reorganization costs, fundamental fairness requires that McKesson be allowed an administrative claim under Bankruptcy Code section 503(b)(1)(A).  McKesson was injured first by Debtor's fraud in acquiring the

Reclamation Goods based on written and oral misrepresentations.  McKesson was injured again by Debtors' failure to return the Reclamation Goods to McKesson upon its lawful demand, or to turn over that portion of the proceeds of the Reclamation Goods that were not used to pay the Lenders.  Again, as eloquently stated in *O'Rieley*, "it would be unjust to permit general creditors to benefit at the expense of one whose assets come into a bankrupt's possession under conditions which warrant recession."  297 F.2d at 9.  Accordingly, McKesson is entitled to an administrative claim under Bankruptcy code section 503(b)(1)(A) on account of its reclamation rights.

Even if the Panel does not outright reverse and hold that McKesson is entitled to an administrative claim pursuant to section 503(b)(1)(A), it should at least remand the issue to the Bankruptcy Court to be reconsidered under the proper legal standard— a standard that does not require a post-petition transaction as a predicate to such an administrative claim.

## E.  <u>The Bankruptcy Court Erred Procedurally</u>

As demonstrated above, the Bankruptcy Court simply assumed, with no evidence (and in the face of countervailing evidence) that all the proceeds of the Reclamation Goods went to pay the Lenders.  That assumption ran afoul of the Scheduling Stipulation and the agreed process for determining McKesson's right to an administrative claim.  Pursuant to the Scheduling Stipulation, determination of

47

the McKesson Administrative Claim would be bifurcated.  The Bankruptcy Court would first hear and determine legal issues in connection with the claim.  Specifically, the Initial Hearing would be only on the legal issues relevant to McKesson's entitlement to assert and receive an allowed administrative claim and the necessary facts related thereto.  To the extent the Bankruptcy Court determined that McKesson was entitled legally to assert an administrative claim on account of its reclamation rights, the parties were to agree on a schedule for discovery and an evidentiary hearing to adjudicate any factual issues requiring resolution.

To begin with, in connection with the Initial Hearing Debtors did not even allege, must less support by evidence, that all proceeds of the Reclamation Goods were used to pay down the claims of the Lenders.  Yet, as described in detail above, that assumption was the underpinning of all of the Bankruptcy Court's legal rulings.  Logically, if the Bankruptcy Court believed that because all the proceeds were paid to the Lenders McKesson had no legal right to assert an administrative claim, the converse must be true—to the extent that the proceeds did not go to pay down the Lenders, McKesson is legally entitled to assert and administrative claim.  The Bankruptcy Court should have scheduled a Second Hearing to determine this fundamental factual issue after discovery and evidence.  Accordingly, at a minimum this Court should reverse and remand with instructions to determine the factual issue at a Second Hearing in accordance with the Scheduling Stipulation.

48

## VIII.
## <u>CONCLUSION</u>

The Bankruptcy Court's erroneous rulings left McKesson with a right without a remedy.  For the reasons discussed above, the Court should reverse the Bankruptcy Court's ruling and hold that McKesson is entitled to an administrative claim on account of its reclamation rights.  If not that, the Court should remand to the Bankruptcy Court with instructions to (1) comply with the process under the Scheduling Stipulation and hold an evidentiary hearing on the relevant factual issues; and (2) consider McKesson's right to an administrative claim pursuant to Bankruptcy Code section 503(b)(1)(A) under the correct legal standard.

CLINE WILLIAMS WRIGHT
JOHNSON & OLDFATHER, L.L.P.
Richard P. Garden, Jr., #17685
Michael J. Whaley, #19390
Sterling Ridge
12910 Pierce Street, Suite 200
Omaha, NE  68124
Telephone:  (402) 397-1700
rgarden@clinewilliams.com
mwhaley@clinewilliams.com

BUCHALTER
a Professional Corporation
Jeffrey K. Garfinkle (admitted *pro hac vice*)
Paul S. Arrow (admitted *pro hac vice*)
18400 Von Karman Avenue
Irvine, CA 92612
Tel: (949) 760-0182
jgarfinkle@buchalter.com
parrow@buchalter.com

BN 38038816v4

## Certificate Pursuant to Federal Rule of Bankruptcy Procedure 8015(h)

The undersigned certifies that the forgoing brief contains 11,499 words, and accordingly, complies with the type-volume limitation set forth in Federal Rule of Bankruptcy Procedure 8015(a)(7)(B).

/s/ Michael J. Whaley

## CERTIFICATE OF SERVICE

I hereby certify that on the 30th day of October, 2019, I caused the above document to be filed in the United States District Court for the District of Nebraska's CM/ECF system which gave electronic notification electronically upon all parties who filed an appearance or requested notice by electronic filing in this case.

/s/ Michael J. Whaley

4844-6161-7323, v. 1

# SHOPKO AMENDED DIP BUDGET

**Shopko**
**DIP Budget**
**($ in 000s)**

| ($ in 000s) | Petition 2018 Jan-19 01/19/19 | 2018 Jan-19 01/26/19 | 2018 Jan-19 02/02/19 | 2019 Feb-19 02/09/19 | 2019 Feb-19 02/16/19 | 2019 Feb-19 02/23/19 | 2019 Feb-19 03/02/19 | 2019 Mar-19 03/09/19 | 2019 Mar-19 03/16/19 | 2019 Mar-19 03/23/19 | 2019 Mar-19 03/30/19 | 2019 Mar-19 04/06/19 | 2019 Apr-19 04/13/19 | 13 Week Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **I. Cash Flows** | | | | | | | | | | | | | | |
| **Receipts** | | | | | | | | | | | | | | |
| 1.) Sales Receipts | 13,891 | 41,113 | 36,301 | 33,265 | 39,940 | 35,788 | 37,064 | 42,503 | 41,802 | 40,613 | 40,343 | 38,247 | 40,442 | 481,313 |
| 2.) Proceeds from Rx Asset Sales | 322 | 289 | 6,701 | 19,378 | 10,117 | 10,339 | 124 | 2,901 | - | - | - | - | - | 50,171 |
| 3.)   Total Receipts | 14,213 | 41,402 | 43,002 | 52,643 | 50,058 | 46,127 | 37,188 | 45,404 | 41,802 | 40,613 | 40,343 | 38,247 | 40,442 | 531,484 |
| **Operating Disbursements** | | | | | | | | | | | | | | |
| 4.) Merchandise Disbursements | (161) | (5,307) | (8,814) | (13,470) | (9,152) | (4,377) | (1,453) | (8,130) | (7,941) | (8,671) | (7,855) | (4,732) | (3,780) | (83,844) |
| 5.) Payroll, Payroll Tax, & Benefits | (1,394) | (535) | (12,932) | (1,427) | (10,765) | (1,062) | (10,470) | (1,192) | (10,679) | (1,201) | (9,985) | (1,694) | (10,031) | (73,367) |
| 6.) Sales Tax | - | (8,445) | (3,224) | (873) | (1,747) | (2,329) | (873) | (743) | (1,487) | (3,717) | (743) | (743) | (1,601) | (26,528) |
| 7.) Other OpEx | (427) | (3,874) | (8,394) | (4,574) | (8,013) | (4,895) | (6,630) | (8,149) | (7,173) | (6,730) | (5,813) | (6,757) | (5,210) | (76,638) |
| 8.)   Subtotal | (1,982) | (18,161) | (33,364) | (20,345) | (29,677) | (12,663) | (19,426) | (18,214) | (27,280) | (20,319) | (24,397) | (13,926) | (20,623) | (260,376) |
| **Non-Operating Disbursements** | | | | | | | | | | | | | | |
| 9.) Capital Expenditures | - | - | - | (89) | (72) | (27) | (30) | (47) | (22) | (120) | (25) | (24) | (81) | (539) |
| 10.) Interest & Financing | (2,417) | (432) | (3,423) | (53) | (30) | (46) | (1,958) | - | (133) | (61) | (59) | (2,016) | (80) | (10,708) |
| 11.) Restructuring Related | (6,300) | - | (86) | - | (8,049) | - | (2,705) | (3,020) | (5,348) | (2,200) | (2,200) | (2,975) | (9,925) | (42,808) |
| 12.)   Subtotal | (8,717) | (432) | (3,509) | (141) | (8,151) | (73) | (4,693) | (3,067) | (5,504) | (2,381) | (2,285) | (5,015) | (10,086) | (54,054) |
| 13.) Total Disbursements | (10,698) | (18,592) | (36,872) | (20,487) | (37,828) | (12,736) | (24,120) | (21,282) | (32,784) | (22,700) | (26,681) | (18,942) | (30,708) | (314,430) |
| 14.)   Net Cash Flow | 3,515 | 22,810 | 6,130 | 32,156 | 12,230 | 33,391 | 13,069 | 24,123 | 9,018 | 17,913 | 13,661 | 19,305 | 9,733 | 217,054 |
| **II. Financing** | | | | | | | | | | | | | | |
| 15.) Beginning Bank Cash | 50 | 675 | 6,933 | 4,640 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 |
| 16.) Net Cash Flow | 3,515 | 22,810 | 6,130 | 32,156 | 12,230 | 33,391 | 13,069 | 24,123 | 9,018 | 17,913 | 13,661 | 19,305 | 9,733 | 217,054 |
| 17.) Revolver Borrowings / (Pay Down) | (2,890) | (16,552) | (8,423) | (36,746) | (12,230) | (33,391) | (13,069) | (24,123) | (9,018) | (17,913) | (13,661) | (19,305) | (9,733) | (217,054) |
| 18.)   Ending Bank Cash | 675 | 6,933 | 4,640 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 |
| **II. Availability** | | | | | | | | | | | | | | |
| 19.) Gross Borrowing Base | 464,954 | 444,176 | 419,305 | 388,120 | 359,390 | 333,523 | 323,387 | 308,358 | 286,260 | 271,143 | 254,809 | 238,380 | 218,584 | 218,584 |
| 20.) Beginning Revolver Balance | 344,006 | 341,117 | 324,565 | 316,142 | 279,395 | 267,166 | 233,775 | 220,706 | 196,584 | 187,566 | 169,652 | 155,991 | 136,686 | 344,006 |
| 21.) Revolver Borrowings / (Pay Down) | (2,890) | (16,552) | (8,423) | (36,746) | (12,230) | (33,391) | (13,069) | (24,123) | (9,018) | (17,913) | (13,661) | (19,305) | (9,733) | (217,054) |
| 22.) Additional Paid in Capital | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 23.) Ending Revolver Balance | 341,117 | 324,565 | 316,142 | 279,395 | 267,166 | 233,775 | 220,706 | 196,584 | 187,566 | 169,652 | 155,991 | 136,686 | 126,953 | 126,953 |
| 24.) + Letters of Credit | 23,431 | 21,595 | 21,595 | 21,595 | 21,595 | 21,595 | 21,595 | 21,595 | 21,595 | 21,595 | 21,595 | 21,595 | 21,595 | 21,595 |
| 25.) + Accrued Interest & Fees | 127 | 594 | 1,001 | 1,460 | 1,908 | 2,326 | 823 | 1,207 | 1,582 | 1,941 | 2,288 | 675 | 995 | 995 |
| 26.) Total ABL Obligation | 364,675 | 346,753 | 338,737 | 302,450 | 290,668 | 257,695 | 243,124 | 219,385 | 210,743 | 193,188 | 179,873 | 158,956 | 149,543 | 149,543 |
| 27.) ABL Availability | 100,280 | 97,423 | 80,568 | 85,670 | 68,721 | 75,828 | 80,262 | 88,973 | 75,517 | 77,955 | 74,936 | 79,424 | 69,041 | 69,041 |
| 28.) Total Gross Liquidity | 100,955 | 104,356 | 85,208 | 85,720 | 68,771 | 75,878 | 80,312 | 89,023 | 75,567 | 78,005 | 74,986 | 79,474 | 69,091 | 69,091 |
| 29.) - Availability Block [Original] | (50,000) | (50,000) | (50,000) | (50,000) | (50,000) | (50,000) | (50,000) | (50,000) | (50,000) | (50,000) | (50,000) | (50,000) | (50,000) | (50,000) |
| 30.) Total Net Liquidity | 50,955 | 54,356 | 35,208 | 35,720 | 18,771 | 25,878 | 30,312 | 39,023 | 25,567 | 28,005 | 24,986 | 29,474 | 19,091 | 19,091 |